IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| JUDITH HEENAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:09cv75-MHT |
| | ) | (WO) |
| MARILYN RHODES, | ) | |
| DEBBIE GAGNON, | ) | |
| CICELY BAUGH-HOOTEN, | ) | |
| CAM HAMILTON, | ) | |
| JUD MCCARTHA, | ) | |
| JUANITA LANDERS, | ) | |
| RAMONA LAZENBY, | ) | |
| and ANITA ALL, | ) | |
| | ) | |
| Defendants. | ) | |

OPINION

In this lawsuit, plaintiff Judith Heenan claims that
her dismissal as a student from the School of Nursing at
Auburn University at Montgomery (AUM) in Montgomery,
Alabama violated of federal law because, among other
things, it was in retaliation for her criticisms of the
school's grading and disciplinary system.  She rests her
claims on the First and Fourteenth Amendments to the

United States Constitution as enforced through 42 U.S.C.
§ 1983.  She names as defendants in their 'individual
capacities' a number of AUM instructors and
administrators.  Jurisdiction is proper pursuant to 28
U.S.C. § 1331 (federal question).

This case is now before the court on the defendants'
motion for summary judgment on all claims.  For the
reasons that follow, summary judgment will be entered in
favor of the defendants.


I. SUMMARY-JUDGMENT STANDARD

"A party may move for summary judgment, identifying
each claim or defense--or the part of each claim or
defense--on which summary judgment is sought.  The court
shall grant summary judgment if the movant shows that
there is no genuine dispute as to any material fact and
the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a).  The court must view the
admissible evidence in the light most favorable to the

non-moving party and draw all reasonable inferences in favor of that party. <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

## II. BACKGROUND

### A.

Heenan enrolled as a student in the AUM School of Nursing in 2004. The nursing school uses a 'point system' to address and prevent unsafe practices and unprofessional behavior among students, both in the classroom and in the clinical environment. This policy was published in the 2006-2007 Nursing Student Handbook under the title "Unsatisfactory/Unsafe Clinical Practice Policy," and it requires that students "demonstrate professionalism and safe practice at all times." Defs.' Ex. 4 at 36 (Doc. No. 46-3). The handbook also notes that, "Any behaviors inconsistent with this expectation will be documented and remain a part of the student's

clinical performance record throughout the nursing performance." Id.

Such unsafe or unprofessional behaviors "have a point value attached to them," and, once a student receives a disciplinary point, the clinical faculty member meets with the student to complete an "occurrence report" in order to document the incident that led to the assignation of the point. Id. An "accumulation of 4 points [results] in a full review of the student's clinical performance record by the Clinical Review Panel." Id. This panel, which includes the Assistant Dean of the School of Nursing, the Nursing Resource Center Coordinator, and another course faculty member, discusses the student's record and recommends a "program of remediation," "course failure," or "dismissal ... and possible disenrollment ... from the [nursing] program." Id. at 37.

In addition to abiding by specific professional criteria, "[s]tudents enrolled in the Upper Division

nursing courses must receive a grade of C or above in order to progress in the nursing program." Id. at 28. Those "who receive a grade of D or F may repeat a course one time. ... If the second attempt is unsuccessful, or if the student receives a D or F in another nursing course, the student will be disenrolled from the School of Nursing." Id.

The Student Handbook sets forth a three-step appeals procedure for students to contest a failing grade awarded by an AUM faculty member. The student must, first, prepare a letter to the dean "outlining reasons for the grade grievance," indicate the "remedy sought," and "provide all relevant evidence." Id. at 40. A departmental grade grievance committee is organized to review the evidentiary materials and then make a recommendation to the Dean of the School of Nursing "to raise, lower, or leave the grade intact." Id. The dean informs "both the faculty member and student of the decision within three weeks of the student's letter."

5

Id. Either the faculty member or the student may then appeal the decision to the Vice Chancellor of Academic Affairs.

### B.

In October 2004, Instructor Cicely Baugh-Hooten gave Heenan one disciplinary point for exhibiting unprofessional behavior after receiving a poor rating on a 'skills validation,' where a student is judged on her ability to meet pre-determined criteria correlating with a specific nursing skill. After receiving an evaluation of 'unsatisfactory,' Heenan requested to be evaluated by another instructor and demanded to see Barbara Witt, the Dean of the School of Nursing. Both requests were denied; however, Heenan did meet with Baugh-Hooten and Instructor Tracey Hodges, who staffed the Nursing Resource Center, in order to discuss the evaluation. During this meeting, Hodges informed Heenan that she could properly receive a point for being disrespectful to

6

a faculty member.   In the form explaining the basis for the point, Baugh-Hooten stated that "[Heenan's] loud, harsh verbal comments [in reaction to her poor evaluation] coupled with expressive gestures were perceived to be argumentative, demanding, and threatening." Defs.' Ex. 6 (Doc. No. 46-4); Heenan Dep. at 84-85 (Doc. No. 46-1).

In a later conference with Instructor Baugh-Hooten and Assistant Dean Nancy McDonald, Heenan maintained that she had been unfairly evaluated.  Following this meeting, Heenan wrote apology letters to McDonald and Baugh-Hooten in an effort to "mend some bridges," Heenan dep. at 109 (doc. no. 46-1), though she continued to take issue with Baugh-Hooten's assessment.   Heenan testified that, in receiving a point, she had been punished for "complaining and going over [Baugh-Hooten's] head."   Id. at 142.

In February 2005, Instructor Cam Hamilton assigned Heenan her second point for "failure to complete clinical preparation assignments, such as drug cards or plan of

7

care." Id. at 129.  Everyone in the class who failed to turn in the required assignment received a point.  Heenan later complained to Arlene Morris, Hamilton's superior, stating that Hamilton did not make it clear that the particular assignment was due on that day in question and that she "disagreed" with the instructor's disciplinary action.  Id. at 145-46.

During the summer of 2005, Heenan took Nursing 3530, a theory course, and received a failing grade.  In 2006, Heenan repeated this course, as well as the clinical co-requisite, Nursing 3531, for which Marilyn Rhodes was her instructor.  Rhodes assigned a point to Heenan for "inadequate knowledge of treatments, medications, or plan of care," id. at 163, after finding that Heenan exhibited poor judgment in attempting to use a thermometer with which she was unfamiliar during the treatment of a patient.  Following the thermometer incident, Rhodes admitted to Heenan that she was undecided as to whether a point was appropriate; Heenan replied, "[P]oints are

stupid.  Go ahead." Id. at 317.  Rhodes allocated the point.

In the spring 2007 term, Heenan took a clinical course with Instructor Juanita Landers.  After observing Heenan's clinical performance, Landers completed an occurrence form, documenting six areas of concern, including untimely drug administration, improper drug calculation, improper use of a blood pressure cuff, wound care, and incomplete documentation.  Heenan testified that Landers "targeted her" throughout the clinical evaluation in retaliation for Heenan's repeated complaints to other faculty members about the arbitrary nature of AUM's point system. Id. at 181.

Following the clinical review, Instructor Debbie Gagnon asked Heenan to repeat three days of clinical evaluation, supervised again by Instructor Landers. During the rotation, Landers charged Heenan with incorrectly charting a patient's information and failing to locate the medical administration records; Landers

also "screamed" at Heenan. Id. at 203. Heenan then informed Landers that she could not work with her, as Landers "was too intimidating"; Heenan stated that she was going "to leave and go and talk ... to Ms. Rhodes." Id. at 206. Heenan then left the facility. Landers assigned her a point for leaving the clinical facility without permission, writing in her occurrence report that Heenan "refused to reconsider [the] situation [or] stay to work things out and left abruptly." Defs.' Ex. 29 (Doc. No. 46-11).

After Heenan received this fourth point, Instructors Baugh-Hooten and Jud McCartha and Assistant Dean Ramona Lazenby met in a Clinical Review Panel to discuss Heenan's academic performance. The three faculty members recommended course failure for Nursing 4911 and its co-requisite class, 4910, on the grounds that Heenan lacked "basic skill performance," had "difficulty with appropriate communication," lacked "critical thinking," and had "ineffective self-awareness," defs.' ex. 32 (doc.

10

no. 46-12); Instructors Rhodes and Gagnon concurred with the recommendation.  On February 1, 2007, Dean Witt sent Heenan a letter, informing her that, because she had received two failing grades, she was to be "disenrolled" from the School of Nursing in accordance with AUM policy.

Upon receiving Dean Witt's letter, Heenan initiated an appeals process, contesting the failing grade in her clinical course and submitting documentation in support of her request to be readmitted to the school.  In the first of a series of hearings, which took place on March 19, 2007, Heenan met with Assistant Dean Lazenby and Instructors Rhodes and Gagnon, who gave her a "math test" and quizzed her on medical protocol and procedures. Heenan Dep. at 235.  Following this meeting, Anita All, the Director of the AUM Joint Master of Science in Nursing Program, set a second appeals hearing for March 27, 2007.  On March 26, Heenan left a message on All's answering machine, requesting that she be allowed legal representation at the hearing the next day.  Director All

informed her that the hearing would be cancelled if she brought counsel.

At this second hearing, three faculty members, including Director All and Instructors Arlene Morris and Landers, met with Heenan to discuss Heenan's course failure in Nursing 4911. After reviewing the relevant documentation and listening to Heenan's testimony, the second appeals committee also recommended course failure. Dean Witt sent Heenan a letter, approving the committee's finding and confirming Heenan's disenrollment from the school.

On April 12, 2007, a third level "Formal Document Review" was conducted by five other AUM faculty members. In a letter dated August 13, 2007, a representative of the third appeals committee wrote Heenan and informed her that the instructors had "unanimously determined that [her] appeal not be upheld, and the procedural failure (leaving the clinical site without proper notification to hospital staff or instructor) in NURS 4911 will stand."

Defs.' Ex. 49 (Doc. No. 46-22).   This decision was reviewed and confirmed by AUM Chancellor John Veres.

In November 2007, Heenan submitted a complaint to the Commission on Collegiate Nursing Education, an accreditation commission, claiming that AUM employed an arbitrary and discriminatory system of discipline.   One year later, in October 2008, the commission determined that AUM operated in compliance with national standards. Heenan never returned to the School of Nursing; she received a Liberal Arts degree from AUM in 2008, and she was expected to graduate with a master's degree in Public Administration in May 2010.

Throughout her academic career at AUM, Heenan vocally opposed the school point system as an arbitrary and subjective method of discipline.[1]   She routinely

_____

1. Heenan testified: "It became so overwhelming to me how the point system was used and abused ... it was something that I thought was ... forcing the ousting of good students such as myself and ... several others that I could name and keeping some of the students that should have never graduated who - people who violated ethics and who did things that plainly they should have been (continued...)

13

"discussed the point system with other nursing students and with friends and with students at AUM who were not nursing students." Heenan Dep. at 40.  These discussions took place at "various locations in the school," including the lab, where clinical validations took place, in the student break room, the bathroom, the hallway, the elevator, and in front of the school mailboxes.  <u>Id</u>. at 47-48.  Heenan was vehement in her opposition to the system, noting that "anytime anybody got a point ... if they seemed upset or mentioned to me that they got a point, I would usually address it."  <u>Id</u>. at 71.  As these conversations took place throughout the school, where there is not "a lot of privacy," bystanders often joined in the conversations, and both students and school faculty were frequently "within earshot" of the discussions.  <u>Id</u>. at 50.  For instance, Instructor McCartha oversaw the lab where, on more than one

_____

    1. (...continued)
expelled for, but they didn't.  They were allowed to graduate."  Heenan Dep. at 56 (doc. no. 46-1).

14

occasion, Heenan voiced her criticisms of the point system, while other faculty members may have heard her address the topic in the school's public meeting areas.[2] Heenan also criticized the disciplinary system in front of Instructors Baugh-Hooten, Hamilton, Rhodes, and Landers as well as before her instructors' superiors.

Following her expulsion and the culmination of the appeals process, Heenan filed this federal lawsuit. She named the following AUM instructors and administrators as defendants: Rhodes, Gagnon, Baugh-Hooten, Hamilton, McCartha, Landers, Lazenby, and All.

_____

2. <u>See</u> Heenan Dep. at 63 (doc. no. 46-1)("Q: And no faculty members participated in those conversations that you had with [your fellow students]; is that right? Heenan: No, they didn't--no one participated in the conversation[s], but they were certainly in the vicinity. Q: Who was in the vicinity? A: Depending on the day and time, it would have been--any faculty members at all could have been in the vicinity of ... the hallway, the classroom. Q: Is it possible that other faculty or students may have passed by you while you were having a conversation? A: Right. Right. Q. But you can't identify any faculty member who heard your conversation? A: Right.").

15

### III. DISCUSSION

### A.  Retaliation Claim

Heenan claims that, in violation of the First Amendment, the defendants affirmed her failing grade in Nursing 4911 and expelled her in retaliation for her repeated and public criticisms of the school's disciplinary point system.  The defendants assert they are shielded in their individual capacities from liability for damages by 'qualified immunity.'

The qualified-immunity defense protects officials from damages in their individual capacities "'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Randall v. Scott, 610 F.3d 701, 714 (11th Cir. 2010) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  As this court discussed in Wallace v. Jackson, 667 F. Supp. 2d 1267 (M.D. Ala. 2009) (Thompson, J.), "'To invoke qualified immunity the [defendants] must first establish that [they were] acting

16

within the scope of [their] discretionary authority' when the alleged violation occurred." 667 F. Supp. 2d at 1272 (citations omitted). If the defendants were engaged in a discretionary function, "then the burden shifts to [Heenan] to show that the defendant[s] [are] not entitled to qualified immunity." Id. Heenan must show that "(1) the defendant[s] violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." Id. Further, the court may exercise its "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id. (quoting Pearson v. Callahan, 555 U.S. 223, ___, (2009)).

As for the first prong, a public employee acts within his discretionary authority by "(a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." Holloman ex rel. Holloman v.

17

<u>Hardland</u>, 370 F.3d 1252, 1265 (11th Cir. 2004).   It is undisputed that, in allocating course grades and participating in the academic disciplinary process, the defendants were engaged in activities pertinent to their employment as university faculty.   The defendants have clearly met their initial burden.

The issue is whether the defendants violated clearly established constitutional law by both affirming Heenan's failing grade in Nursing 4911 and upholding her disenrollment from the School of Nursing.   In order to overcome qualified immunity on her retaliation claim, Heenan must initially demonstrate (1) that her speech was constitutionally protected; (2) that the defendants' retaliatory conduct adversely affected her protected speech; and (3) that there is a causal connection between their retaliatory actions and the adverse effect on her speech.   <u>Bennett v. Hendrix</u>, 423 F.3d 1247, 1250 (11th Cir. 2005).   The first matter of inquiry is whether Heenan's speech is, in fact, protected.

Heenan asserts that the applicable criterion for adjudging her claim is elucidated in <u>Tinker v. Des Moines Independent Community School District</u>, 393 U.S. 503, 514 (1969), under which student speech is protected to the extent that it does not reasonably cause school officials "to forecast substantial disruption of or material interference with school activities."[3]  She states that

_____

3. In opposing Heenan's claim and to assert that her speech is not subject to constitutional protection, the defendants invoke the legal standards set forth in <u>Pickering v. Board of Education</u>, 391 U.S. 563 (1968), and <u>Connick v. Myers</u>, 461 U.S. 138 (1983), which address the speech rights of public employees in the workplace. Under <u>Pickering</u>, a court must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568.  To merit this type of balancing, a public employee must first engage in speech that "touch[es] upon a matter of public concern."  <u>Connick</u>, 461 U.S. at 147.  The defendants contend that Heenan spoke neither as a citizen, nor on a matter of public concern, and thus her speech is not covered under the First Amendment.

However, it has been stated that "the public concern doctrine does not apply to student speech in the university setting," <u>Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn</u>, 280 F.3d 98, 106 (2nd Cir. 2001), but rather, the doctrine is "reserved for situations where
(continued...)

the defendants have failed to show that her speech had "either a non-negligible disruptive effect or [was] likely to have such effect on classroom or educational process[es]," and thus her speech is protected.  Pl.'s Br. at 10 (Doc. No. 52).  Adopting this standard, the Eleventh Circuit Court of Appeals has stated that "student speech must at least be likely to cause a

_____

3. (...continued)
the government is acting as an employer."  Id.  See also Pinard v. Clatskanie School Dist. 63, 467 F.3d 755, 766 (9th Cir. 2006) ("Although Connick's personal matter/public concern distinction is the appropriate mechanism for determining the parameters of a public employer's need to regulate the workplace, neither we, the Supreme Court nor any other federal court of appeals has held such a distinction applicable in student speech cases.").  Though enrolled in a public professional school, Heenan was still categorically a student, and not an employee, when she made the challenged speech.  The court here has, therefore, assumed that Pickering-Connick does not apply.

    In any event, even if Pickering-Connick applied here, Heenan would still not prevail.  First, her speech would not be protected, and, second, if it were protected, the evidence, as shown later in this opinion, is overwhelming that she received a failing grade and was dismissed from the Nursing School because she was poor, uncooperative, and even rude student.

material and substantial disruption, ... and more than a brief, easily overlooked, <u>de minimis</u> impact, before it may be curtailed." <u>Boim v. Fulton County School Dist.</u>, 494 F.3d 978, 983 (11th Cir. 2007) (emphasis in original) (citations and quotation marks omitted).

However, the <u>Tinker</u> standard was developed in the context of political speech, after a student engaged in expressive activity in order to comment on a matter of public import. The Supreme Court recently noted in <u>Morse v. Frederick</u>, 551 U.S. 393 (2007) that: "The essential facts of <u>Tinker</u> are quite stark, implicating concerns at the heart of the First Amendment. The students sought to engage in political speech, using the armbands to express their 'disapproval of the Vietnam hostilities and their advocacy of a truce, to make their views known, and, by their example, to influence others to adopt them.'" 551 U.S. at 403 (citations omitted). In reviewing the factual basis for <u>Tinker</u>, the Court affirmed that, "Political speech, of course, is 'at the core of what the First Amendment is designed to protect.'" <u>Id</u>. (quoting

21

<u>Virginia v. Black</u>, 538 U.S. 343, 365 (2003) (plurality opinion)).

Though <u>Tinker</u> may constitute the vanguard for student-speech analysis, its reach does not extend over those cases to which it was never intended to apply.  For instance, the <u>Tinker</u> Court emphasized in its ruling that the case did not "concern speech or action that intrudes upon the work of the schools or the rights of other students." <u>Tinker</u>, 393 U.S. at 508.  That is exactly the type of case, however, that Heenan has presented to this court.  She asserts that she repeatedly complained about the School of Nursing's internal disciplinary policy, or 'point system,' both to the administration and the teaching staff, and challenged the grading and disciplinary practices of individual school instructors within the classroom setting.

This type of non-political speech is more akin to that described in <u>Hazelwood School Dist. v. Kuhlmeier</u>, 484 U.S. 260, 271 (1988), in which the Court held that a school could lawfully censor the articles in an on-campus

22

high school newspaper, as the publication was intricately connected to the school's educational curriculum.  In so finding, the Court distinguished <u>Tinker</u>, noting that when a school may punish student expression and when it may refuse to promote student expression requires the application of two different standards and that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." <u>Id</u>. at 273. The <u>Hazelwood</u> Court recognized that this more school-friendly standard "is consistent with our oft-expressed view that the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." <u>Id</u>.  For it "is only when the decision to censor ... has no valid educational purpose that the First Amendment is so 'directly and sharply implicate[d],' as to require judicial intervention to

protect students' constitutional rights." Id. (citations omitted) (alteration in original).

Heenan's case does not directly involve the school-sponsored dissemination of student speech. However, the law in Hazelwood has been adopted by other courts faced with the question of what protections are due student expression that touches upon internal school matters of pedagogical and curricular concern. These cases have found that "Hazelwood does not require [the courts] to balance the gravity of the school's educational purpose against [the student's] First Amendment right to free speech, only that the educational purpose behind the speech suppression be valid." Curry v. ex rel Curry v. Hensiner, 513 F.3d 570, 579 (6th Cir. 2008) (finding a student's First Amendment rights were not implicated when the school refused to allow him to sell religious cards as part of a school project). See O'Neal v. Falcon, 668 F. Supp. 2d 979, 984 (W.D. Tex. 2009) (Rodriguez, J.) (declaring that a professor's refusal to permit a student to give a speech on abortion in his class did not violate

24

the student's free speech rights) ("Plaintiff relies on
Tinker and other cases concerning speech made outside the
curriculum to argue that her First Amendment rights were
violated because Defendants cannot show that the
expression would materially and substantially interfere
with the operation of the school. However, as noted,
different standards apply to speech made as part of the
curriculum.").

In a case closely analogous to Heenan's suit, Brown
v. Li, 308 F.3d 939 (9th Cir. 2002), the Ninth Circuit
Court of Appeals addressed the First Amendment
protections due a graduate student who challenged an
internal university policy. Specifically, a student
asserted that the decision of the university to reject
his thesis, after he submitted a non-conforming
"Disacknowledgments" section, which contained derogatory
comments directed at university officials, teachers, and
the university curriculum, constituted a violation of his
free speech. In its preliminary discussion, the court
noted that "the parties have not identified, nor have we

25

found, any Supreme Court case discussing the appropriate standard for reviewing a university's regulation of students' <u>curricular</u> speech." <u>Brown</u>, 308 F.3d at 949 (emphasis in original). However, in a review of the applicable caselaw, it determined that "<u>Hazelwood</u> articulates the standard for reviewing a university's assessment of a student's academic work" and that, under this precedent, the thesis section was not protected. <u>Id</u>. In its holding, the court explained that "the curriculum of a public educational institution is one means by which the institution itself expresses its policy, a policy with which others do not have a constitutional right to interfere." <u>Id</u>. at 951. Comparing the challenged thesis to the newspaper at issue in <u>Hazelwood</u>, the <u>Brown</u> court emphasized that educators retain the prerogative of constitutionally censoring "poor grammar, writing, or research because to reward such expression would 'materially disrupt' [the school's] curricular purpose." <u>Id</u>. at 948 (quoting <u>Hazelwood</u>, 484 U.S. at 283-84) (alteration in original). That is, where

26

a student's speech threatens a school's pedagogical and curricular system, it is not subject to the expansive protections applied to student political speech under <u>Tinker</u>.

That the <u>Brown</u> plaintiff was a college student did not diminish the university's right to limit speech related to the curriculum: "To the extent that the Supreme Court has addressed the difference between a university's regulation of curricular speech and a primary or secondary school's regulation of curricular speech, it has implied that a university's control may be broader." <u>Id</u>. at 951.  This is, in part, because a university student's right to free speech must be balanced against the rights enjoyed by university professors to academic freedom; instructors must be allowed "'to make decisions about how and what to teach.'" <u>Id</u>. (quoting <u>Bd. of Regents of Univ. of Wis. Sys. v. Southworth</u>, 529 U.S. 217, 237 (2000) (Souter, J., concurring)).

27

The legal maxim recognizing that professors and students may maintain competing freedoms in the realm of on-campus speech has been further delineated by the Sixth Circuit Court of Appeals. In Parate v. Isibor, 868 F.2d 821, 828 (6th Cir. 1989), the appellate court held that, "The freedom of the university professor to assign grades according to [her] own professional judgment is of substantial importance to that professor" 868 F.2d at 828. The court further explained that,

> "To effectively teach her students, the professor must initially evaluate their relative skills, abilities, and knowledge. The professor must then determine whether students have absorbed the course material; whether a new, more advanced topic should be introduced; or whether a review of the previous material must be undertaken. Thus, the professor's evaluation of her students and assignment of their grades is central to the professor's teaching method."

Id. Similarly, in Settle v. Dickson County School Bd., 53 F.3d 152, 155 (6th Cir. 1995), in which the Sixth Circuit found a student's First Amendment rights were not violated when a teacher awarded a score of 'zero' on her

28

paper addressing the life of Jesus Christ, the court emphasized that, "The free speech rights of students in the classroom must be limited because effective education depends not only on controlling boisterous conduct, but also on maintaining the focus of the class on the assignment in question." Id. Therefore, while "teachers should not punish or reward people on the basis of inadmissible factors," including "race, religion, gender, [and] political ideology," it is for the teacher to "decide which arguments are relevant, which computations are correct, which analogies are good or bad, and when it is time to stop writing or talking." Id. To this end, "[g]rades must be given by teachers in the classroom, just as cases are decided in the courtroom"; "teachers, like judges, must direct the content of speech." Id.

With this precedent in mind, the court turns to the question of whether Heenan's complaints concerning the AUM disciplinary system constitute protected speech under the First Amendment. Based on the record and the evidence at hand, the court finds they do not. In

29

fulfillment of their duties as educators, the defendants are tasked with inculcating the necessary knowledge, values, and experience, so that their nursing students can become valued and reliable members of the medical community upon graduation.  It is with this purpose that the School of Nursing employs a grading and disciplinary policy to ensure that students do not pass courses or receive a diploma before they are capable of exemplifying satisfactory and safe nursing practices.  Under Hazelwood, the maintenance of a grading and disciplinary system that allows the school to graduate competent nurses is clearly "reasonably related to legitimate pedagogical concerns." 484 U.S. at 273.

Moreover, the evidence is clear that Heenan challenged the policy solely to her own benefit; that is, far from making the more wide-spread public statement of the kind involved in Anderson-Free v. Steptoe, 993 F. Supp. 870 (M.D. Ala. 1997) (DeMent, J.), in which a university professor engaged in protected speech by submitting a memorandum that openly criticized the

30

Alabama State University's grading and graduation policies, the record here shows that Heenan criticized the 'points system' only because she herself received points for failing to complete classroom tasks adequately, for performing poorly in clinical evaluations, and for exhibiting unprofessional behavior in a professional environment. Further, far from demonstrating that the points system is "arbitrary" and "subjective," Heenan's own evidence indicates that, by identifying her as an ill-prepared and uncooperative student, the policy worked as intended. Prior to receiving the fourth point that led to her expulsion, Heenan acquired three other points from three separate instructors, all for different reasons, but all related to her performance in the classroom, and all of which were reviewed and affirmed by the instructors' supervisors. Far from a victim of retaliation, the evidence suggests that Heenan was merely a poor, uncooperative, and even rude student, whose school record was commensurate with her inability to 'measure up.'

31

Heenan's claim that she engaged in protected speech by contesting her poor grades and disciplinary points directly to individual AUM instructors ("points are stupid"), including Baugh-Hooten, Rhodes, and Hamilton, is equally unviable. It is the role of teachers, and not federal judges, to define a school's educational curriculum--the courts may only step in "when the decision to censor ... student expression has no valid educational purpose." Hazelwood, 484 U.S. at 273. Settle stated definitively that, "Grades must be given by teachers in the classroom, just as cases are decided in the courtroom." 53 F.3d at 155. The discretion granted teachers to award grades and dole out discipline related to academic achievement should not be stymied by the judiciary, unless there is evidence of improper motive in the suppression of speech. Id. See also Board of Curators of the Univ. of Mo. v. Horowitz, 435 U.S. 78, 90 (1978) (discussing the procedural protections due a student expelled from medical school) ("Like the decision of an individual professor as to the proper grade for a

32

student in his course, the determination of whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking."). Heenan has shown no evidence of improper motive (race or gender discrimination, etc.) on the part of the defendants, and the court finds no indication of such on the record.

Furthermore, as the defendants are "jointly responsible" for their students' educational credentials, they retain an affirmative right to fail, and even expel, those students who are unable to meet the institution's curricular requirements and standards. <u>Brown</u>, 308 F.3d at 952 (The thesis committee "had an affirmative First Amendment right not to approve Plaintiff's thesis. That is especially true where, as here, the committee members' names appear in the thesis and where ... they are jointly responsible for its content. The presence of Defendants' affirmative right underscores Plaintiff's lack of a First Amendment right to have his nonconforming thesis

approved.") (citations omitted).  If Heenan were allowed
to graduate without the knowledge necessary to serve as
a skilled nurse, by its bestowal of a diploma, AUM would
effectively be providing a stamp of approval on Heenan's
incompetence.  AUM, and its professors, have the right to
refrain from making this statement.

Heenan's retaliation claim boils down to an effort by
a student to get judicial review of her academic
performance through a First Amendment claim that her
gripes about the grading system used to measure that
performance warrant such review.  Is there a student who
has not at some point in her academic career felt
(beginning as early as the first grade) that a grading
system was unfair or that a particular teacher had
applied the system in an unfair manner?  Especially in
that instance where the student has received a grade she
considers to be lower than that deserved?  Indeed,
student gripes about grading probably date back to that
first time a teacher gave a student a grade the student
did not like.  Therefore, one of the traits of a good

teacher is the ability to get a student, finally, to stop blaming others (including her teacher) for the bad grade she has received. How teachers grade, and, in particular, how they treat those students who attempt to use gripes about grades and the grading systems as excuses for poor performance, is one of those pedagogical concerns that are at the heart of teaching profession. These gripes, whether voiced privately or openly, are generally not constitutionally protected speech subject to court review.

Moreover, even if Heenan's speech were protected, her retaliation claim would still be meritless, for the evidence is, simply put, overwhelming that her speech was not causally connected to her dismissal from the Nursing School. No reasonable factfinder could find that there was a causal connection. Even if one or all the defendants had a retaliatory motive, Heenan would still have received a failing grade and been dismissed. As stated, far from a victim of retaliation, the evidence is conclusive that Heenan was merely a poor, uncooperative,

and even rude student, whose nursing-school record was commensurate with her inability to 'measure up.'   <u>See</u> <u>Castle v Appalachian Technical College</u>, ___ F.3d ___, ___, 2010 WL 5158157 (11th Cir. 2010) ("Assuming for the sake of argument that there was a retaliatory motive, this record ... establishes that [defendants] did in fact also possess a lawful motive for suspending Castle, and that they reasonably believed that they would have suspended Castle in the absence of her protected speech because of her other conduct."). In sum, the court will not allow Heenan to bypass the legitimate academic requirements of the AUM School of Nursing by bootstrapping her private grievances into a First Amendment claim. As Heenan has failed to establish her First Amendment retaliation claim, that claim fails on the merits. And, because the claim fails on the merits, the defendants are entitled to qualified immunity. Summary judgment will be granted on Heenan's First Amendment retaliation claim.

## B. Freedom of Association Claim

Heenan also claims a violation of her First Amendment right to freedom of association. However, in her brief opposing summary judgment, she admits "she was unable to conduct meaningful discovery, due to economics, to properly pursue said allegations." Pl.'s Br. at 17 (Doc. No. 52). After reviewing the record, and in light of Heenan's admission that the evidence does not substantiate a violation of her association rights, the defendants are entitled to qualified immunity, and summary judgment will be granted on this claim.

## C. Redress and Right to Legal Counsel Claim

Heenan further claims that, in violation of the First Amendment Petition Clause and the Fourteenth Amendment Due Process and Equal Protection Clauses, the defendants denied "her rights to seek redress of grievance" as well as "her rights to seek legal counsel." Compl. at 4 (Doc. No. 1). Heenan does not distinguish between these

37

claims; however, the court analyzes them separately in light of their independent factual and legal foundations.

The First Amendment provides, in relevant part, that "Congress shall make no law ... abridging ... the right of the people ... to petition the Government for a redress of grievances." Heenan claims that the defendants violated her right to petition for redress when they prohibited her from complaining about her "illegal treatment ... to the Dean of the AUM Nursing School." Compl. at 4 (Doc. No. 1). The defendants respond that, after Heenan was disenrolled from the School of Nursing, "she took her appeals through multiple levels of review, all the way to Chancellor John Veres," and thus she "cannot credibly claim to have been denied any right to have her grievances heard." Defs.' Br. at 43 (Doc. No. 45). The court finds that, if it could be said that such a claim is cognizable under the law, Heenan failed to establish that claim here. Because the claim lacks merit, the defendants are entitled to

38

qualified immunity on it.   Summary judgment will be granted on this claim.

In her supporting brief, Heenan cites a variety of Supreme Court cases, each of which addresses the right of individual citizens to petition government and administrative entities.   See BE & K Const. Co. v. N.L.R.B., 536 U.S. 516, 526 (2002) (holding that sham antitrust litigation must be "objectively baseless" in order for the suit to fall outside the protections of the First Amendment's petition clause); Wayte v. United States, 470 U.S. 598 (1985) (finding the government's passive enforcement policy as to the Selective Service registration laws did not violate petitioner's First Amendment rights to redress and freedom of speech); McDonald v. Smith, 472 U.S. 479 (1985) (holding that the First Amendment right to petition the government did not provide absolute immunity for defendant charged with sending libelous materials to the President of the United States).   The aforementioned cases, however, are not on

39

point.   Heenan does not assert that the defendants prohibited her from petitioning the school for redress, but rather that, as a student at a public university, she was entitled to greater legal protections than she received during the course of her disciplinary process. At its core, this is a claim for procedural due process and is not cognizable under the First Amendment.  Even if Heenan's complaint could be construed as asserting a valid 'redress' claim, the mere fact that Heenan was required to meet with Assistant Dean McDonald, rather than Dean Witt, after receiving a point from Instructor Baugh-Hooten, is hardly sufficient to constitute a violation of her First Amendment rights, and Heenan provides no case law that would support such a finding.

In sum, Heenan hints at a procedural due process violation, and she should have addressed it as such, rather than requesting relief under the auspices of First Amendment law.   However, it is not the court's prerogative to 'make' the plaintiff's case, when she

40

herself has failed to do so.  See Bell Aerospace, Inc. V.

U.S. Aero Services, Inc., 690 F. Supp. 2d 1267, 1274

(M.D. Ala. 2010) (Thompson, J.) (The court "is under no

obligation to comb through [the evidence] to help a party

meet its burden under the law.").   Because Heenan's

'redress of grievance' claim lacks merit, the defendants

are  entitled  to  qualified  immunity  on  this  claim.

Summary judgment will be granted on this claim.

Heenan  also  claims  that  the  defendants  (and

Instructor  All  in  particular)  denied  her  access  to

counsel  during  the  school's  disciplinary  appellate

proceedings, in violation of her procedural due process

rights under the Fourteenth Amendment.  She states that

All failed to justify "the denial of [her] request for a

lawyer," despite the fact that "[a] legal advocate ...

would  have  been  able  to  greatly  assist  [her]  in  her

efforts  to  petition  [AUM]  for  redress,"  due  to  the

"complex  factual  and  legal  issues"  at  stake  in  her

expulsion case.  Pl.'s Br. at 16 (Doc. No. 52).

41

It is well-established that, while students facing academic disciplinary proceedings must be granted a "right to respond" to the relevant charges, the procedural rights of such petitioners "are not co-extensive with the rights of litigants in a civil trial or with those of defendants in a criminal trial." <u>Nash v. Auburn</u>, 812 F.2d 655, 664 (11th Cir. 1987). <u>See also</u> <u>Goss v. Lopez</u>, 419 U.S. 565, 579 (1975) ("At the very minimum, ... students facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing."). Critical to this caselaw is the recognition that classrooms are not courtrooms, and the law does not treat them as such. <u>See</u> <u>Horowitz</u>, 435 U.S. at 88. Therefore, "procedural due process in the context of a school disciplinary proceeding does not require all the trappings or procedural safeguards of a criminal trial because 'formalizing hearing requirements would divert both resources and attention from the educational

**42**

process.'"   Nash v. Auburn, 621 F. Supp. 948, 953 (M.D.

Ala. 1985) (Hobbs, J.) (citations omitted), aff'd, 812

F.2d 655 (11th Cir. 1987).   In this vein, "the great

majority of cases support the conclusion that students

facing disciplinary charges have no absolute right to

have an attorney present their case."   Id. at 957

(collecting cases).[4]

    Therefore, there is no right to an attorney in school

disciplinary proceedings, and the law imposes only basic

procedural    obligations    upon    the    teachers    and

administrators who operate academic hearings.   Based on

this   deferential   standard,   it   is   clear   that   the

defendants provided the requisite safeguards.   Heenan was

entitled to three hearings on the matter of her course

failure, two conducted by School of Nursing faculty, and

_____

    4. The defendants contest Heenan's allegation that
she was not allowed to have a lawyer present; they assert
that she was told that if she wanted legal representation
during the disciplinary hearings, university counsel
would also have to be present.   However, at this stage in
the litigation, the court takes the facts in the light
most favorable to the plaintiff and, thus, assumes that
Heenan was refused a lawyer.

one conducted by a committee comprised mainly of faculty members from outside the school. The final outcome was then reviewed by the AUM Chancellor. Heenan was allowed to submit documentation in her favor prior to each of these hearings, and she was invited to attend any proceedings that were conducted in a live hearing format. Furthermore, at each stage of the appellate process, Heenan was provided notice of the upcoming hearings, and thereafter given a letter describing their outcomes. Based on the record, there is no evidence to support a finding of a procedural due process violation, even if Heenan was denied access to counsel at each of these hearings. Because her 'right to counsel' claim lacks merit, the defendants are entitled to qualified immunity on it. Summary judgment will be granted on this claim.

\*\*\*

44

For the foregoing reasons, summary judgment will be entered in favor of the defendants in their individual capacities on all of Heenan's claims.[5]  An appropriate judgment will be entered.

DONE, this the 27th day of December, 2010.

<u>    /s/ Myron H. Thompson    </u>
**UNITED STATES DISTRICT JUDGE**

---

5. Heenan does not make clear in her complaint whether the defendants are sued in their 'individual' or 'official' capacities or both.  However, because the parties appear to have tried the case as if the defendants have been sued in their individual capacities only, the court has treated the case as such.  In any event, for the reasons given in this opinion, summary judgment is appropriate on all claims on the merits to the extent it could be argued that Heenan seeks injunctive relief from the defendants in their official capacities.  As stated, the evidence is overwhelming that Heenan was a poor, uncooperative, and even rude student whose nursing-school record was commensurate with her inability to 'measure up' and that she received an abundance of due process before she finally received her failing grade and was dismissed from the AUM School of Nursing.